Argued October 13, affirmed November 1, 1961

# HECKER *v.* CROWN MILLS
### 365 P. 2d 840

*Philip A. Levin,* Portland, argued the cause for appellant. On the brief were Pozzi, Levin & Wilson, Portland.

*Kenneth E. Roberts,* Portland, argued the cause for respondent. With him on the brief were Mautz, Souther, Spaulding, Kinsey & Williamson and Roland F. Banks, Jr., Portland.

Before ROSSMAN, J., presiding, and WARNER, SLOAN, O'CONNELL, GOODWIN, LUSK and BRAND, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Roger A. Hecker, from a judgment of the circuit court which dismissed his complaint and ruled that he take nothing. The judgment was based upon findings of fact and conclusions of law. The action was predicated upon charges that the defendant, Crown Mills, through failure to exercise requisite care, injured the plaintiff. Crown Mills was not the plaintiff's employer; the latter was Portland Stevedoring Company. Both of those employers were subject to the workmen's compensation law (ORS 656.002 through 656.990) and were contributors to the industrial accident fund. The injury occurred while the plaintiff was pursuing his duties as a longshoreman in the employ of Portland Stevedoring Company (not a defendant) upon a wharf which was a part of the defendant's plant. According to the plaintiff, he "stepped in a hole" in the wharf's floor and was injured. The defendant's plant is in Portland.

The defendant's motion to dismiss was based upon ORS 656.154 which provides that:

"* * * no action shall be brought against any such third person if he or his workman causing

the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman

\* \* \*

"(2) As used in this section, 'premises' means the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation."

The appellant's (plaintiff's) brief states:

"The only question of law presented by this appeal is whether or not the trial court erred in determining that the provisions of ORS 656.154 applied to the facts shown by the record of this case; in other words, whether or not defendant and plaintiff's employer had joint supervision and control over the premises on which plaintiff was employed, as that phrase is defined by the statute and the applicable authorities."

The defendant's plant consisted of a flour mill, a warehouse and the wharf upon which the plaintiff was injured. The warehouse was immediately adjacent to the mill and lay between the latter and the wharf. The wharf was twelve feet wide and extended the length of the warehouse along the Willamette River. At the time of the plaintiff's injury a steamship was moored alongside the wharf and a crew of longshoremen, of which the plaintiff was a member, was loading sacked flour into it. Prior to the arrival of a ship the flour, as produced in the mill, was stored in the warehouse so that it could be promptly loaded into the vessel. We mentioned that a crew of longshoremen was loading flour into the vessel which lay at the wharf. In fact, two crews were engaged in that work. One, of which the plaintiff was a member, was in the employ of the

Portland Stevedoring Company. The other was in the defendant's employ. That crew brought the sacked flour on lift trucks from inner parts of the warehouse to a place (in the warehouse) which the briefs term the cold deck. The latter was nothing but a small part of the warehouse floor near a door which led directly to the hatch of the ship through which the flour would enter the vessel. The longshoremen came to the cold deck, loaded the sacks of flour upon their lift trucks and hauled them to the wharf near a hatch of the vessel. There the sling men took it over and through use of the ship's gear hoisted the flour into the vessel.

We have quoted the issue submitted by the appeal as it is phrased in the plaintiff's (appellant's) brief, and will now seek to determine whether the two employers or their workmen had "joint supervision and control" over the place of injury and whether they were engaged there "in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation." The quoted words are parts of ORS 656.154, supra.

The evidence is virtually free from conflict. It indicates that a ship which comes to the defendant's wharf to receive cargo engages the stevedoring firm which will stow the sacked flour into its hold. The crew of longshoremen which will load the flour into the vessel includes a checker for each of the vessel's hatches. Before the sacks of flour are touched the checker enters the warehouse and there he and the warehouse foreman agree upon the flour which is to be lowered through that checker's hatch into the vessel. They count and agree upon the number of sacks. Thomas Baracco, the defendant's warehouse foreman, referring to a checker, testified:

"You take him to the various places, or the par-

ticular place that the flour was to go into that particular hatch and he would count the flour in the pile before we ever touched it.

"Q I see. Now, he comes in to the warehouse and he checks the flour in the particular pile; is that flour to go on the ship?

"A That is the flour to go on the ship.

"Q Does he do that with you?

"A Yes, sir. And we have to agree before the flour is ever touched—before that pile is ever touched."

After the checker and the warehouse foreman have agreed upon the flour which is to enter a particular hatch of the vessel, the defendant's lift truck operators take up the task of bringing it from the place in the warehouse where it is piled to the cold deck. According to the plaintiff, the cold deck was about twenty or thirty feet from the door, but inside the warehouse. As the flour was deposited in the cold deck by the defendant's lift truck operators the longshoremen in the employ of the stevedoring company went to the cold deck with lift trucks, picked up the piles of flour and hauled them to a spot on the wharf adjacent to a hatch where other longshoremen, known as "sling men," hoisted it aboard the vessel. The last phase of the operation, hoisting the flour aboard the vessel, was done with the ship's tackle. The plaintiff was a sling man. The work of the defendant's employees in bringing the flour to the cold deck and of the longshoremen of getting it there and hauling it onto the wharf, proceeded simultaneously.

It will be noticed that the trip, which was made by the flour from the place where it was stored in the warehouse to the spot on the wharf where the sling

men hoisted it into the vessel, was broken into two parts. The reason for the interruption or break in the trip is unimportant to our issues, but the record indicates that it was due to a rule of a labor union which the employers accepted.

When the flour was stored in the warehouse there was placed under each pile an object known as a pallet board. The latter weighed fifteen to twenty pounds. The pallet boards were still under the piles when the latter reached the sling men on the wharf. There they were thrust aside as the sacks of flour were placed in nets preparatory to being hoisted into the ship. The sling men, upon discarding the pallets, sometimes placed them inside the door of the warehouse and at other times piled them on the outside of that structure. The defendant's lift truck operators occasionally went to the place where the pallets were piled and brought them to their proper place in the warehouse and at other times that service was performed by the longshoremen.

The defendant's warehouse foreman testified: "I cover the whole dock and even go onto the ship from time to time." In explanation of his action he testified in part that it was his duty to see to it that all of the lighting for the dock was in good condition and that if a light burned out he replaced it. The plaintiff's injury occurred at night time. The warehouse foreman also testified that when all of the flour had entered the ship's hold he crossed the wharf, boarded the vessel and obtained "a receipt signed by the supercargo." The defendant's assistant warehouse foreman testified that upon the occasion in question he was operating a lift truck and came into close proximity with the longshoremen; his words were, "very close, yes."

The findings entered by the circuit court included the following:

"* * * the plaintiff and employees of the defendant commingled in the work or common activity in which they were respectively engaged and that was the loading of sacks of flour aboard the vessel SS Illinois.

*　　　*　　　*

"* * * at the time of the accident occurring on the 27th day of October, 1958, plaintiff and his employer, Portland Stevedoring Company, were on premises over which plaintiff's employer and Crown Mills had joint supervision and control and were engaged in the furtherance of a common enterprise and the accomplishment of the same or related purposes * * *."

The foregoing is a sufficient review of the evidence; through resort to the trial judge's findings of fact, above quoted, his reaction to the evidence is manifested.

We see from the foregoing that two crews were needed to bring the flour from the warehouse into the ship's hold. The two crews performed integrant parts of services and work which the defendant wished to have performed, that is, (1) an agreement upon the flour and the exact quantities thereof that was to be taken from the warehouse into the ship's hold, (2) the work of conveying the flour from the warehouse into the vessel and, (3) a recovery of the pallet boards.

No line painted upon the floor of the wharf marked the area in which one crew worked and from which the other was forbidden. No iron curtain or other barrier prevented intermingling. Some intermingling was demanded. As shown in preceding paragraphs, it occurred when (1) the checker entered the warehouse and together with the warehouse foreman agreed

upon and counted the sacks of flour that were to be loaded into the ship; (2) the warehouse foreman or his assistant in maintenance of the wharf's facilities, went out upon that structure; (3) the defendant's lift truck operators and those of the longshoremen rubbed shoulders at the cold deck; (4) occasionally the defendant's lift truck operators and at other times the longshore lift truck operators brought the pallet boards from the wharf into the warehouse and (5) the warehouse foreman at times boarded the vessel and in so doing crossed the wharf. Thus, the facts clearly indicate that intermingling to a material extent took place constantly. In any event, it warranted the trial judge's finding "the plaintiff and employees of the defendant commingled in the work."

The next question is, does the evidence above reviewed warrant the finding that plaintiff's injury occurred upon "premises over which plaintiff's employer and Crown Mills had joint supervision and control and were engaged in the furtherance of a common enterprise." It will be recalled that the injury occurred upon the wharf where the plaintiff worked as a sling man and not in the warehouse.

The quoted words which compose a part of the preceding paragraph were taken from one of the findings of fact. Subsection (1) of ORS 656.154, in referring to the injury-inflicting employer as "such third person," states that no action shall be brought "against any such third person if he or his workmen causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to" the workmen's compensation law. Subsection (2) of the same provision of our laws makes the term "premises," as found in the language

just quoted, mean "the place where the employer, or his workmen causing the injury, and the employer of the injured workman are engaged in the furtherance of a common enterprise or  *  *  *."

The words of ORS 656.154 which we just quoted seem to be clear in their meaning. Any member of our profession would feel offended if accused of not being able to grasp the significance of the words "premises over which he had joint supervision and control." Likewise, he would protest that even a layman can readily discern the purport of a term such as "furtherance of a common enterprise."

Nevertheless, some counsel declare that the meaning of those terms, as they are found in ORS 656.154, has become obscure. It occasionally occurs that the profession does not fully accept into the body of law on a parity with all other legal principles a newly enacted statute until it has received application or interpretation by the courts; after the latter has taken place, the words of the courts rather than those of the statute become a part of the law's vocabulary. When counsel criticize the court's language concerning an application of ORS 656.154 they generally compare a passage which they selected from one decision with a part that they took from another. In short, complaining counsel reason from case to case and in so doing are neglectful of the words of the statute which the judge very likely deemed a part of his language when he wrote the challenged passage.

At times counsel misread a plain provision of ORS 656.154. For example, the brief of the appellant (plaintiff) filed in this case, referring to the work of the sling men, says: "Defendant had no connection with this operation, and no supervision thereof. It merely furnished the premises upon which the work

was to be done." ORS 656.154 does not demand that the defendant have "connection with this operation" and supervision over it. The words of ORS 656.154 are: "on premises over which he had joint supervision and control with the employer of the injured workman." It will be observed that the words of the statute are "on premises."

The legislature, in writing an act, and this court, in preparing its opinions, have at their command only words with which to express ideas. The sculptor has at his avail marble, bronze and other materials; the painter possesses a full palette of colors and may make use of canvas, boards or parchment. The architect may resort to drawings, specifications and even models. But a statute and a legal opinion can be couched only in words, and the latter present the difficulty of multiple meanings. Accordingly, it is understandable that when the advocate of one point of view compares two or more precedents and, in so doing turns his eyes from the controlling statute such as ORS 656.154, he may find ground for criticism. The latter may be centered not so much in a difference in meaning between the two selected passages as in a disagreement with the court's application of them to the case in hand. Several of our decisions that have applied the act take note of the fact that the circumstances of each case must never be lost sight of. For example, the late Mr. Justice Tooze, in his specially concurring opinion in *Johnson v. Timber Structures, Inc.,* 203 Or 670, 677, 281 P2d 723, was careful to state: "It is true also that no matter what rule may be established, its meaning will always depend upon the particular facts before the court * * *."

No case that was previously decided by this court presented facts that totally parallel those of the case

at bar. The defendant-respondent deems that *Inwall v. Trans-Pacific Lumber Co.*, 165 Or 560, 108 P2d 522, which was decided twenty years ago and was the pioneer in this field, is a virtual twin to the case at bar. The plaintiff-appellant, although not mentioning the fact that twins must be born concurrently, finds several differences between the two cases upon which we shall not dwell. We are satisfied that no previous decision of this court sufficiently parallels the one at bar to render it advisable to claim similitudes.

As previously stated, the two crews intermingled. They handled the same objects of commerce, that is, sacks of flour. They served the same purpose—getting the flour into the vessel's hold. Although the sling men, of whom the plaintiff was one, did not use lift trucks, all of the other workmen used that type of implement. Thus, this is not a case in which one workman was a carpenter, another a plumber, a third a plasterer, and so on. All of these workmen were of the same general category—handlers of sacked flour. The plaintiff and the other sling men came into close contact with the lift truck operators; in fact, they received the sacks of flour from the very hands of the lift truck operators. The members of both crews, that is, of the defendant and of the stevedoring company, did work of the same general kind—loading flour into the vessel. Commingling, cooperation and concert of effort of the two crews were essential to the satisfactory dispatch of the work on hand. Each man was interested in and dependent upon the skill and efficiency of all of the others.

To undertake to separate the two crews, or the sling men from the lift truck operators as though they spoke different languages or lived on opposite sides of a China Wall, would be alien to what was actually

going on when the injury occurred. The men at that moment were loading flour into the vessel, and, in order to do so effectively, were required to cooperate completely.

We think that it is plain that both of the two sets of emloyers had "joint supervision and control" over the place where the injury occurred. The complaint alleges:

"At all times herein mentioned Crown Mills * * * was in control of or operated a certain dock, grain elevator and warehouse * * * and was involved in work involving risk and danger * * *.

"* * * plaintiff was upon said dock as an employee of a master stevedore working as a sling man and longshoreman, and while hooking up a load on said dock, he was caused suddenly and unexpectedly to step into a hole * * *."

We think that those averments, together with the testimony given by the witnesses, establish that the two employers and their workmen had "joint supervision and control" over the premises. Likewise, we believe that the same facts indicate that the plaintiff's employer and Crown Mills were engaged at the place of the plaintiff's injury "in the furtherance of a common enterprise," that is, of loading sacked flour into the vessel. That was, in truth, the only reason why the two crews were there. Had it not been for the "common enterprise" neither crew would have been present; and if only one of them had been there it could have moved no flour from the place where it was stored in the warehouse to the spot on the wharf where the sling men worked.

The plaintiff points out that in all of our previous cases the plaintiff sustained his injury through the

action of another workman, whereas in the case at bar the injury occurred through a defect of the premises. The Workmen's Compensation Act renders compensation payable in either of those events, and, as we have seen, the case meets all demands of the act such as employers who are under the act, have joint supervision and control, and were engaged in the furtherance of a common enterprise.

We have given all of our precedents careful consideration. In fact, we have reread all of them with care. Were we able to do so, it is possible that we might wish to eliminate a word here or there that was previously written.

"The Moving Finger writes; and, having writ,
Moves on: nor all your piety nor wit
Shall lure it back to cancel half a line,
Nor all your tears wash out a word of it."

We think, however, that our precedents are in substantial accord and that it is unnecessary to go back and attempt to re-edit them. None of them are adverse to the circuit court's disposition of this case. The words of ORS 656.154 that are of plain meaning clearly control this case. The statute is all important and if one bears that in mind as he reads the precedents he should have no trouble.

The judgment of the circuit court is affirmed.